LOUGHNEY and others, Appellants, vs. LOUGHNEY and others, Respondents.

*January 30 — February 23, 1894.*

*Wills: Mental capacity: Evidence.*

1. The scrivener who drew a will was the principal witness relied upon by contestants to show the mental incapacity of the testator. Such scrivener was named as executor in the will and signed the same as an attesting witness. He had presented the will for probate, with a petition, under oath, stating that the will was "duly made and executed" as he was informed and believed. He testified that in his opinion the testator had not mental capacity to make a will, but the facts to which he testified indicated the contrary. *Held,* that the witness had been guilty of a gross impropriety, and that he was impeached by his own testimony.

2. The evidence in this case (showing, among other things, that although the scrivener sought to influence him not to make the will, the testator had sufficient mental force to insist upon and secure its execution, and that he gave full directions as to the disposition of his property) is *held* to show that the testator was mentally competent to make the will.

[3. Whether nonexpert witnesses, other than the attesting witnesses, may give their opinions as to the mental capacity of a testator, not determined.]

APPEAL from the Circuit Court for *Waukesha* County.

On December 1, 1888, John Loughney made a will, which was drawn by James Smith. The attesting clause was signed by said Smith and by W. F. Malone, M. D., as attesting witnesses. By such will, after the payment of his just

debts, funeral expenses, and costs of administration, the
testator devised and bequeathed to his brother James, re-
siding in Waukesha, or to his heirs, the sum of $1,500; to
the children of his brother Matthew, or to the survivor of
them, the sum of $1,500, share and share alike; to the
children of his brother Anthony, or to the survivor of
them, the sum of $1,500, share and share alike; and all the
rest of his estate he thereby devised and bequeathed to the
children of his brother Anthony, share and share alike.
He therein nominated and appointed said James Smith as
executor of said will and testament, with such powers as
are allowed by law, and therein directed him to see to his
burial and all necessary affairs connected therewith, at such
expense as he might deem prudent, and that he might pay,
in addition to his funeral expenses, a sum not exceeding
$50 for such religious purposes and uses as he might deem
best for the testator's spiritual welfare.

About 6 or 7 o'clock on the evening of March 17, 1892,
the said John Loughney made his last will and testament,
drawn by the said James Smith, who wrote at the bottom
thereof the words, " John $\overset{\text{his}}{\underset{\text{mark}}{}}$ Loughney [Seal]," with an
attesting clause signed by said Smith and Charles Deiner,
in the words and figures following, to wit: " On this 17th
day of March, A. D. 1892, the above testator, John Lough-
ney, signed, sealed, published, and declared the foregoing
instrument as his last will and testament in our presence,
and we, at his request and in his presence and in the pres-
ence of each other, signed our names as subscribing wit-
nesses."    Said will provided, in effect, that, after the
payment of the just debts, funeral expenses, and costs of
administration of said testator, he thereby willed, devised,
and bequeathed to the children of his brother James, re-
siding in Waukesha, the sum of $1,000, share and share
alike; to the children of his brother Anthony, residing in

the town of Muskego, Waukesha county, the sum of $1,000, share and share alike; to the children of his brother Matthew, residing in the town of New Berlin, in said county, all the remainder of his estate, share and share alike. He therein nominated and appointed said James Smith the executor thereof as his last will.

About 4 o'clock on the morning of March 18, 1892, the said John Loughney died. On May 17, 1892, the said James Smith presented to the county court his verified petition, wherein he represented and stated, in effect, that said John Loughney died March 18, 1892; that he left personal estate amounting to about the value of $3,000, but no real estate; that he left, him surviving, neither widow nor issue, nor father nor mother, but the brothers and sisters mentioned, all of whom were of full age, as his next of kin and heirs at law. Said petition also contains the following clauses: "Your petitioner further shows that deceased left a will duly made and executed, as petitioner is informed and believes, which is herewith presented to the court, and that James Smith, the petitioner, is named executor therein; wherefore your petitioner prays that said will may be proved and allowed as the last will and testament of said deceased, and letters testamentary to him be issued thereon according to law."

On June 14, 1892, after hearing the proofs of the respective parties, the said county court found as matters of fact, in effect, that March 17, 1892, the said John Loughney was of an unsound mind and memory, and mentally incompetent to execute the instrument offered for probate, purporting to be the last will and testament of said deceased; that said instrument was signed, and purported to have been executed, by the said John Loughney, deceased, March 17, 1892; that said instrument was not the last will and testament of said deceased, he being at the time incompetent to execute said instrument according to law,—and the

.same was accordingly disallowed, and probate thereof refused.

The case was taken by appeal to the circuit court for Waukesha county, where the same was tried by the court and a jury.   At the close of such trial the court submitted to the jury this question: "Was John Loughney, on the 17th day of March, 1892, of sound, disposing mind and memory?" which the jury answered, "Yes." The contestants thereupon moved the court to disregard said verdict of the jury, and to deny the probate of said will, but the court denied each and every part of such motion so made by said contestants.   On December 10, 1892, the said court entered judgment, reciting, in effect, that the questions were whether said deceased was of sound mind and disposing memory at the time of the execution of said last will and testament and whether said deceased was under undue influence at said time, and that a trial thereof had been duly had with a jury, and both of said issues or questions had been found in the affirmative by said jury, and that said findings of said jury were thereby made the findings of the court in said matter; and it was therein determined, adjudged, decreed, and ordered, in effect, that said order of the county court be reversed, and that the said last will and testament be duly admitted to probate, with certain directions therein as to costs; and it was therein further ordered that the cause be remitted to said county court for further proceedings according to law, and for the due administration and settlement of the estate of said deceased.   From such judgment the contestants appeal.

For the appellants there was a brief by *D. J. Hemlock*, attorney, and *Ryan & Merton*, of counsel, and oral argument by *Mr. Hemlock* and *Mr. T. E. Ryan*.   To the point that it was error to permit nonexpert witnesses, other than the subscribing witnesses, to give their opinions as to the mental capacity of the testator, they cited *Clapp v. Fullerton*,

34 N. Y. 190; *Holcomb v. Holcomb*, 95 id. 316; *In re Coleman*, 111 id. 220; 1 Greenl. Ev. sec. 440; *People v. Conroy*, 97 N. Y. 62; *O'Brien v. People*, 36 id. 282; *White v. Davis*, 17 N. Y. Supp. 548; *Paine v. Aldrich*, 133 N. Y. 544; *Pennsylvania Co. v. Newmeyer*, 129 Ind. 401; *Real v. People*, 42 N. Y. 270; *Dewitt v. Barley*, 9 id. 371.

*D. H. Sumner*, for the respondents, cited *Burnham v. Mitchell*, 34 Wis. 117; *Will of Jenkins*, 43 id. 610; *In re Lewis's Will*, 51 id. 101; Gary, Probate Law, sec. 205; 1 Redf. Wills, 96, 140–146; 1 Jarman, Wills, (Am. notes), 115–125.

CASSODAY, J.   John Loughney died at the age of seventy-seven.   He left no father or mother or widow or children, and was never married.   His next of kin consisted of three brothers named in the will, and two married sisters,— one residing in Chicago, and the other in Milwaukee.   For about twenty-five years prior to his death he had made his home at his brother Matthew's, except that he had made his home with his brother Anthony from some time in November, 1888, to about March 1, 1892, and except that prior to November, 1888, he had from time to time, for days or weeks, and sometimes for months, been absent from Matthew's, stopping with one or more of his sisters or other brothers.   In the fore part of February, 1892, the testator went to Matthew's, and while there made arrangements to return and make his home thereafter with Matthew.   Anthony went there with him at the time.   In pursuance of such arrangement he returned to Matthew's, and commenced making his home there, about March 1, 1892.   On the evening of March 17, 1892, he executed the written instrument in question, purporting to be his last will and testament, and died about nine hours afterwards.   He left property of about the value of $6,000.   It is conceded that it was duly signed by the testator, and attested and sub-

scribed by two witnesses, as required by the statutes. So it is conceded that there is no evidence that the making or execution of the will was procured by undue influence on the part of any one.

The only controverted question in the circuit court or this court is whether the testator had sufficient mental capacity to make a will at the time of the execution of the paper in question. Eight witnesses on the part of the proponents testify as to their observations respecting him shortly before his death, and give as their opinion, based thereon, in effect, that he was of sound and disposing mind and memory at the time of executing the will. One of these — Charles Deiner — was present during the time the will was being written by James Smith, and he gives a very clear and consistent statement as to what was said and done by the testator and by Mr. Smith during the time. According to his testimony, the testator dictated all the disposing parts of the will.

On the other hand, Mr. Smith and two other witnesses for the contestants testify as to their observations respecting the testator for some time before his death, and give it as their opinion that he was of unsound mind when he executed the will. Mr. Smith, however, appears to have been the principal witness relied on by the contestants. He was manifestly a man of more than ordinary intelligence, and had for several years been in the habit of drawing wills for those living in the vicinity of Hale's Corners, where he resided. He had loaned money for the testator and drawn papers for him for many years. While the testator was living at Anthony's, he drew a will for him, December 1, 1888, and was named as executor therein, and retained the custody of that will up to the time of the trial in the circuit court. Among other things, Mr. Smith testified, in effect, that the testator called upon him at his place February 23, 1892, to release a mortgage and get some money

that he had belonging to the testator; that he made his mark, as usual, to the release of the mortgage; that he did not write, and could not; that he received $160 or $170 from him; that the testator then claimed that he still owed him $400; that he did not look at his books at the time, but that the testator was not correct about it; that Anthony came there with the testator; that, after Anthony left, the testator requested him to get his will and read to him, so that he could see if he recollected what was in it; that he got it from his safe, and read it over to the testator two or three times; that he seemed to recollect it pretty distinctly; that the testator then told him to put the will back in the safe,— that he would not have it long; that he again saw him on business a few days afterwards; that about 8 o'clock on the morning of March 17, 1892, Matthew came after him, and said his brother John wanted him to come over and draw a will or something to that effect, and spoke about some money Smith had belonging to John. He further testified, in effect, that it was about three miles distant; that he did not go over until evening; that he got there between 6 and 7 o'clock; that the testator told him he wanted to change his will; that " he wanted a change made so as to give his brother Matthew's children the remainder in place of his brother Anthony's;" that he wrote it down, accordingly, as he told him, on the back of the old will, as a codicil, and without any further instructions; that after he had completed the codicil, except the attesting clause, he spoke of the necessity of having another witness, and Charles Deiner was sent for; that he then, and before Deiner came, read the codicil to the testator; that the testator then said that he wanted to make a new will; that the testator gave directions for him to draw the new will, and he drew it accordingly; that he did not put anything in the new will on his " own motion, except what John dictated to " him; that he put in the formal parts,

but did not put in any disposing parts; that in the first will he was authorized to spend $50 as he saw fit,— to pay something to the church, and, if he saw fit, treat the boys who attended the funeral; that he asked the testator if he should put that in the last will, and that he said, "No;" that he asked him if he should have his name cut on the monument, and he said, "Yes."

It is true that such testimony of Mr. Smith is interlarded with numerous expressions of his opinion to the effect that the testator had not the mental capacity to make a valid will; but the facts thus admitted are in direct conflict with such expressions of opinion, and are far more convincing. This more clearly appears when we analyze such testimony and compare it with some other testimony in the record. Thus, the codicil which Mr. Smith drew and is in evidence, and which it is conceded the testator refused to execute, left the old will as it was, except that Matthew's children, instead of Anthony's, were therein made residuary legatees; but the will executed, the disposing parts of which Mr. Smith admits were wholly dictated by the testator, drops out the bequest of $1,500 to James, as found in the first will, and in lieu thereof gives $1,000 to the children of James. It also cuts down the specific bequest of $1,500 to the children of Anthony to $1,000. It also omits entirely the specific bequest of $1,500 to the children of Matthew, but makes the children of Matthew the residuary legatees instead of the children of Anthony, as in the first will. So, it omits entirely the $50 which, by the first will, Mr. Smith, as executor, was directed to disburse for the purposes and uses therein mentioned, as he might deem best. It is true the last will makes no mention of either of the two married sisters; but the same is true of the first will, and, according to Mr. Smith, they were left out of that by design. It is true, the attesting clause of the last will does not state that the testator was of sound mind; but neither does the

attesting clause of the first will, drawn by the same witness,— in fact, the two are substantially alike.

But the testimony of other witnesses who were present at the time of making the will place Mr. Smith in a still more unenviable light. The witness Mary Purcel, a school teacher boarding at Matthew's at the time the will was made, among other things testified to the effect that, when she came home from school that night, she passed through the room where Mr. Smith and John were alone, and, as she was going through, she heard John say to Smith, "Do as I want you to," and that Smith replied, "Well, well, John, you and I have had dealings together a long time now. We never had any trouble, and I guess we can get along now;" that John's expression was, "Do as I want you to do." Matthew's daughter Mary, among other things, testified to the effect that, on the evening the will was made, Smith told her that her family were well enough provided for in the first will; that it would be better for them and for her to get her uncle not to make a will that night; that he told her to tell her father to tell John so. The subscribing witness Deiner, among other things, testified to the effect that Matthew's boy came after him; that, when he went into the presence of the testator, he said he had sent for him, as he was going to make a will and wanted him to sign as a witness; that Smith was talking with John, when he went in, about making a will; that Smith asked him why he wanted to make a will; that John told him to go on and make the will, and do as he wanted him to; that Smith then said, "All right," and took a paper and ink, and sat down and wrote off what John told him to write; that it took an hour; that he made the paper just as John told him to make it,— giving, in detail, what he did tell him, and as contained in the will, and also that he told him he was born in 1815. Mr. Smith partially admits what Mary said, but claims he then told her that her uncle

was not in a condition of mind to make a will that night. He also admits that the testator said to him that evening that he (Smith) had some of his money, and that he had nothing to show for it; that he told him that was unusual, that he had done business with him so long and he never had a receipt; that he thereupon wrote out and gave him a receipt or duebill for $400.

It is manifest from the evidence that Mr. Smith sought to influence the testator not to make any change in his will that night, but that he had sufficient mental force to insist upon it and secure its execution, and also to obtain from him written evidence of his moneys then in the hands of Mr. Smith. In addition, Mr. Smith presented the will in question for probate, accompanied by his petition for probate, under oath, in which he stated, among other things, that the "deceased left a will, *duly made and executed*," as he was informed and verily believed. Upon the record before us we are compelled to say that Mr. Smith is impeached by his own testimony, and that, in view of it, his opinion as to the testator's want of capacity is overwhelmingly disproved by the evidence in the case. Certainly, the trial judge was justified, upon his own admissions, in characterizing his conduct as a "gross impropriety." It is doubtful if there is any reported case where a man drew and witnessed a will in which he was named as executor, and then, after petitioning for its probate, as here, sought to have it rejected upon the strength of his own testimony, and it is hoped that there will never be another instance. *In re Lewis's Will*, 51 Wis. 101.

In reaching the conclusions mentioned, we have considered no evidence not clearly admissible. The verdict of a jury, in a case like this, has long been regarded as a verdict on a feigned issue in chancery. It is merely advisory to aid the conscience of the court. *Jackman Will Case*, 26 Wis. 104; *Chafin Will Case*, 32 Wis. 557; *In re Lewis's Will*,

51 Wis. 101; *Wright v. Jackson,* 59 Wis. 584; *Ballantine v. Proudfoot,* 62 Wis. 216. Such being the law and the facts, it becomes unnecessary to consider whether, technically, some of the testimony was not improperly admitted.

*By the Court.*— The judgment of the circuit court is affirmed.