WILL OF MUELLENSCHLADER: TRIELOFF, Executor, Appellant, vs. MUELLENSCHLADER and others, Respondents.

*April 18—May 8, 1906.*

*Wills: Mental capacity: Undue influence.*

1. A finding by a jury, approved by the trial court, to the effect that the testator, at the time he executed the instrument in question, had not sufficient mental capacity to make a will, is *held* to be contrary to the clear preponderance of the evidence, which showed that he had sufficient capacity while the instrument was being drawn by an attorney, to whom he gave full directions therefor, and tended strongly to show that he consciously and understandingly participated in the final execution thereof, although his death followed in a few minutes.

2. The evidence (showing, among other things, that a partner of the testator, to whom he bequeathed a considerable sum, had visited the testator frequently during his illness and did so four times on the day of his death, and that such partner had in his possession at the time the certificates of deposit mentioned in the will and the bank book of the testator) is *held* insufficient to create a presumption of undue influence.

APPEAL from a judgment of the circuit court for Rock county: B. F. DUNWIDDIE, Circuit Judge. *Reversed.*

This is an appeal from a judgment of the Rock county circuit court affirming the judgment of the county court, which denied probate to the writing propounded as the will of Herman Muellenschlader, deceased. It appears that the deceased resided in Rock county at the time of his death and left an estate. The writing now propounded as his last will was submitted for probate to the county court. The widow and the guardian *ad litem* of the infant children of the deceased filed objection to its probate upon the grounds that it was not his will, that he was not of sound and disposing mind when it is alleged to have been made, and that, if made and signed by him, it was procured by the undue influence of *Charles Trieloff*, one of the persons named as a beneficiary in the instrument.

After a trial of the issues before the county court it awarded judgment denying probate to the instrument. Upon appeal from this judgment to the circuit court the issues were tried there by the court and before a jury. In answer to the one question submitted to them the jury found that the deceased was not of sound mind at the time he executed this written instrument. The court made its findings of the facts and refused to probate the instrument as the will of the deceased. Among its findings of fact material to the consideration of this appeal are these:

"9. That it is a peculiarity of peritonitis that the suffering it causes has less effect upon the mental powers, and that persons who die therefrom retain usually their mental faculties longer, stronger, and clearer than in any other disease; that they usually retain consciousness up to a short time before death, and often to the very last; that in the case of the deceased his weakness was such at the time of the making of his mark by him to said instrument, and that his death followed so immediately upon the signing of the instrument by said witnesses, that it is impossible to determine certainly whether deceased was fully conscious of what he was doing when he made said mark, and whether or not he was conscious of the fact of the signing by the witnesses, and for that reason the court approves the finding of the jury.

"10. That the deceased and the legatee, *Charles Trieloff,* were, at the time of the execution of the said instrument offered for probate, copartners and had been such for a number of years prior thereto, and that a confidential relation existed between them as such copartners; that no explanation has been made or suggested as to why the deceased should have given said legatee the legacy specified in said instrument; that said legatee, said *Trieloff,* visited the deceased frequently during his sickness, and was there some four times on the day of his death; that when he was called into the room to assist in determining what the names were, which were in doubt, and the spelling thereof, that he had in his possession, and in his pocket, the several certificates of deposit mentioned in said instrument, and also the bank book belonging to said deceased, and that no explanation has been made

or offered as to how he obtained possession of the same; that the circumstances surrounding the giving of said legacy by the deceased to said legatee are such as to call upon him for explanation and a showing that the same was a free, voluntary, and intelligent act of the deceased, which has not been done."

The instrument bears date January 26, 1904, the day of the death of the deceased. In this instrument the estate of the deceased is bequeathed as follows: (1) To *Charles Trieloff* $2,000; (2) to his son and daughter, equally, the avails of two certificates of deposit in designated banks amounting to about $3,000; (3) to his wife and these children in equal shares a bequest of property in Weld, Germany, stated to be about $3,500; (4) to his brother Charles, of Janesville, Wisconsin, the amount due his estate from August Marx, stated to be $2,000; and (5) the rest of his property to his wife and two children in equal shares.

It appears that at the time of his death he was engaged in the saloon business in partnership with *Charles Trieloff* and that he had been so engaged for a number of years immediately preceding it. He was about forty years of age. He was taken sick on the 24th day of January, 1904, with intestinal trouble. Dr. Woods was called to attend him and had charge of him. On Tuesday, January 26th, Dr. Woods last saw him at about 11 o'clock in the forenoon, and left him in a condition indicating nothing extraordinary or dangerous. At about 1 o'clock of this day his condition had become worse, and Drs. Palmer and Gibson, being called, found him suffering from peritonitis, which they believed to be incident to a bowel perforation. It was not then deemed advisable to undertake an operation. Dr. Palmer saw him thereafter at about 4 o'clock, when he had great difficulty in breathing. There was more distention in the abdominal region and weaker heart action. His appearance was cyanotic, indicating impaired oxygenation of the blood and causing profuse

perspiration.   These symptoms were accompanied by rest-
lessness, vomiting, and much pain.    The doctor had a conver-
sation with him with reference to his property, and he in-
formed the doctor that he had money in banks and some cash
in his pocket.   In response to the doctor's inquiry as to
whether he wanted to make a will he said, "Yes," and upon
being told that he had better get a lawyer he replied in the
affirmative.   In compliance with his wish the doctor caused a
lawyer to be called, and Mr. Sutherland, an attorney, soon ar-
rived at the house, and at the deceased's request the doctor
also sent for *Mr. Trieloff*.   Mr. Sutherland arrived a few
minutes after 5 o'clock, and Dr. Palmer informed him that
the deceased desired to make a will.   In response to Mr. Suth-
erland's inquiry: "Is this man of sound mind?" the doctor
replied, "Yes."   Thereupon Sutherland proceeded to write
the will.   *Mr. Trieloff,* who was then present, left the room
at Sutherland's suggestion.   The deceased gave Sutherland
the names of his partner, *Trieloff,* his wife, children, and his
brother, and enumerated his properties, and directed, as speci-
fied in the instrument, the amounts and kinds to be given to
each.   It appears that in doing this he experienced some diffi-
culty on account of his impaired breathing and his suffering
and great pain.  Dr. Palmer and *Mr. Trieloff,* who was called
into the room after a part of the instrument had been writ-
ten, gave some assistance in correctly getting from the de-
ceased the names of the persons and some foreign places which
were to be written in the paper.   Each provision was written
and read separately, and assented to by him.   When the pa-
per had been written it was placed for signature on a book
before the deceased, while he was in a sitting posture in bed.
On account of his weakness and difficult breathing, upon the
suggestion of Mr. Sutherland, he made his mark instead of
writing his name, which he requested Mr. Sutherland to do.

Dr. Palmer testified that the paper was then removed, and
that Sutherland placed it on a table and wrote, while he, the

doctor, gave the deceased a hypodermic injection or heart stimulant; that he then observed that he was very weak, and stated, "Mr. Sutherland, the man is going; you will have to hurry," and that Sutherland then pushed the paper to him, saying "Sign here;" that he signed it, and then gave his attention to the deceased; that he is not certain whether Sutherland had signed it; that he did not see him sign it, but that he heard him writing; that the deceased dropped into short breathing, commenced to vomit, and that death followed in a few moments.

Mr. Sutherland and *Mr. Trieloff* testify that before the deceased appended his mark to the paper it was read to him in full; immediately after signing it he spoke to Mr. Sutherland, saying that "no administrator" (meaning executor) had been named, and telling Mr. Sutherland that he wanted *Charles Trieloff* named; when asked by Sutherland who that was, he pointed at *Trieloff,* saying, "It is that man there, my partner;" that he then declared it as read to be his will, and desired Palmer and Sutherland to sign as witnesses; that he was lying in a reclining position in his bed when the witnesses signed it on a table near the bed in his immediate presence and in the presence of each other; that thereupon the paper was folded, and that Sutherland stated to the deceased, "You can have this filed with the county judge, or I will keep it and put it in my safe;" and that he replied, "You keep it."

At the conclusion of Dr. Palmer's evidence on direct examination he states that when the deceased executed the will he was, in his opinion, of sound mind. Sutherland and *Trieloff* testify to the same effect. Upon cross-examination Dr. Palmer states that by a sound mind he meant a mind not diseased; and in reply to a question based on his knowledge he answered that in his opinion the deceased had not sufficient actual memory to collect in his mind, and comprehend without prompting, the condition of his property, his relation to his children and others who might properly be his

beneficiaries, and to hold these things in his mind sufficiently to perceive their relation to each other, and to form a rational judgment in relation to them. In response to a hypothetical question Drs. Gibson and Buckmaster express the same opinion. Drs. Woods and Pember expressed a contrary opinion on substantially the same hypothesis.

*William G. Wheeler,* for the appellant.

For the respondent *Anna Muellenschlader* there was a brief by *Fethers, Jeffris & Mouat,* and oral argument by *M. G. Jeffris.* To the point that the law casts upon the appellant the burden of showing that the making of the will was untainted with undue influence and was the intelligent and deliberate act of the grantor, they cited *Davis v. Dean,* 66 Wis. 100, 110; *Cole v. Getzinger,* 96 Wis. 559, 573; *Will of Slinger,* 72 Wis. 22; *Doyle v. Welch,* 100 Wis. 24; *Small v. Champeny,* 102 Wis. 61; *Baker v. Baker,* 102 Wis. 226; *Disch v. Timm,* 101 Wis. 179; *In re Derse's Will,* 103 Wis. 108; *In re Downing's Will,* 118 Wis. 581.

*John Cunningham,* guardian *ad litem* for *Clara* and *Herman Muellenschlader,* contended, *inter alia,* that as to signing and witnessing testator must be mentally observant of the specific act in progress. *Aikin v. Weckerly,* 19 Mich. 482, 504; *Maynard v. Vinton,* 59 Mich. 139, 150, 151. "In presence of" means conscious presence. *Dunlop v. Dunlop,* 10 Watts, 153; 29 Am. & Eng. Ency. of Law (1st ed.) 175. Testator's mind must hold up to the last. Cassoday, Wills, § 447.

Siebecker, J. On its face the paper writing, propounded as the last will of the deceased, presents all the legal formalities requisite to a proper execution of a will, but the circuit court denied probate to it, assigning as one of the grounds "that it is impossible to determine certainly whether the deceased was fully conscious of what he was doing when he signed it (made his mark), or whether or not he was conscious of the fact of the signing by the witnesses." The facts

established by the evidence are set forth in the foregoing statement of facts.   The court evidently concluded that the deceased had the mental capacity and was capable of making a will at the time Mr. Sutherland arrived and conferred with him concerning his property, the provisions of the will, and the persons to whom he wished to bequeath it.   The evidence clearly shows that immediately after the arrival of Dr. Palmer on his 4 o'clock visit the deceased conveyed his wishes and instructions concerning this subject to him in a perfectly intelligent and rational manner, indicating clearly that he then had a full understanding and comprehension of this subject.   Respondents contend that from the time the doctor saw him at 4 o'clock it is apparent that the deceased was so weakened from pain and suffering, and that his mental strength had so rapidly waned, that he had not "sufficient active memory to collect in his mind, and comprehend without prompting, the condition of his property, his relation to his children and other persons who might be the beneficiaries, and the scope and bearing of his will, and to hold these things in his mind for a sufficient length of time to perceive their obvious relations to each other, and be able to form some rational judgment in relation to them."   The direct evidence on this question is limited to that furnished by the three witnesses who were present when the proposed will was prepared and executed.   Their evidence as to what occurred and as to what the deceased said and did is in accord up to the time of the signing of the instrument.   It is clearly established that he freely communicated with Mr. Sutherland in the presence of Dr. Palmer and *Mr. Trieloff,* gave directions as to the disposition of his property, named the beneficiaries, designated the amounts he wished to bequeath to each, and described the specific property of each bequest.   He informed them, in a clear and positive manner, of what property he had, its nature and whereabouts, and expressed approval separately of each bequest after it had been written and read to

him. Upon these points, in the transaction of the making
of this instrument, the evidence of these witnesses is in ac-
cord and as to what actually occurred-and as to deceased's
participation in them. There seems but one inference which
can be drawn from all the facts and circumstances, namely,
that up to the point of the signing and attestation of the in-
strument the deceased was possessed- of sufficient mental ca-
pacity to make a will. The court, however, held that it was
not shown that this state of his mind persisted to the conclu-
sion of the transaction and that he consciously and under-
standingly participated in the final execution of the instru-
ment.

We must turn to the evidence of these witnesses as the only
direct testimony on this branch of the case. The witnesses
Sutherland and *Trieloff* testify positively that the will was
fully written and completed as directed by the deceased; that
it was then read to him as a whole; that he understood it and
declared that it expressed his will; that he signed it by mak-
ing his mark in the manner described by them and Dr. Pal-
mer; that he called Mr. Sutherland's attention to the fact
that no one had been designated in it as executor, and that he
thereafter indicated that he wished his business partner, *Trie-
loff,* named as executor, and that he pointed him out as pres-
ent in the room; that *Trieloff's* name was then inserted and
the will was signed by Dr. Palmer and Mr. Sutherland on a
table placed near his bedside, and in the immediate presence
of the deceased; that Mr. Sutherland then inquired of him
whether he should deposit the instrument for safe-keeping
with the county court or keep it in his safe, and that the de-
ceased then directed him to keep it in his custody. Most of
these material facts are not expressly denied by Dr. Palmer,
but he states that after deceased had attached his signature
he immediately reclined upon the bed, manifested no active
participation in what transpired when he and Mr. Suther-
land signed, that the deceased was then very weak and low,

and that death followed in a very few moments. On direct examination he expressed it as his opinion that the deceased was of sound mind. Upon cross-examination he gave it as his opinion that during the time the transaction took place he had not sufficient mental capacity to make a will. In addition to the direct evidence of these three witnesses there is the opinion evidence of the physicians who testified as experts in support and denial of the fact of the deceased's testamentary capacity. An examination of the evidence given by Dr. Palmer shows that he took an active part, at the request of the deceased, in having the will made and drawn, assisted him in procuring an attorney, and discussed with him the nature of his property and the disposition he wished to make of it. He detailed facts and circumstances showing that the deceased gave him a comprehensive understanding of his purpose, that the deceased directed all the provisions of the proposed will, and that he declared it to be and signed it as his will, and that he (the doctor) signed his name as an attesting witness in the presence of the deceased and the other witness. He also stated to Mr. Sutherland at the commencement of the transaction that the deceased was of sound mind, and upon the trial he stated that he believed his mind was sound when this writing was drawn and signed, but that, in his opinion, the deceased had not sufficient mental capacity to make a will, and that he took no conscious active part in the attestation of the document. The facts and circumstances, as detailed by him, clearly contradict his opinion statements that deceased had not sufficient testamentary capacity and took no conscious part in the attestation. As indicated in *Winn v. Itzel,* 125 Wis. 19, 103 N. W. 220: "Certainly such testimony is thoroughly impeached by the witness himself." *Loughney v. Loughney,* 87 Wis. 92, 58 N. W. 250. All the other evidence, except that of the experts, points clearly and directly to the one conclusion that the deceased was possessed of testamentary capacity, and that he consciously participated in the

completed execution of the instrument, and thereafter gave express direction for its safe-keeping and custody.

It is urged, however, that the fact of testamentary capacity is sufficiently rebutted by the opinions of the experts as to his mental incompetency, and by the facts and circumstances tending to show that the deceased was so weak from sickness that he was in a condition "almost reaching that of profound shock." We do not find these circumstances and the opinion testimony of sufficient weight to throw any uncertainty upon this fact. The opinions expressed by the experts were predicated on conditions, many of which we have shown did not exist, and they therefore are of slight weight in face of the actual facts upon which the contested issues must be determined. A consideration and study of the evidence leads us to the conclusion that this finding of the trial court is against the clear preponderance of the evidence.

The court also found that the circumstances surrounding the giving of the legacy to *Charles Trieloff* were "such as to call upon him for explanation and a showing that the same was a free, voluntary, and intelligent act of the said deceased, which has not been done." This determination of the court is preceded by a recital of facts, stating that the legatee, *Charles Trieloff,* and the deceased were and for a number of years prior to the making of the propounded will had been co-partners in business, and as such a confidential relation had existed between them; that *Trieloff* visited the deceased frequently during his sickness, and did so four times on the day of his death; that he had in his possession the several certificates of deposit and the bank book of the deceased; and that nothing is shown suggesting any reason why deceased "should have given said legatee the legacy specified in said instrument." It is apparent that the trial court regarded these facts and circumstances as a *prima facie* showing that this legacy was procured by the undue influence of *Trieloff.* There is no other evidence on which such an inference can

rest. If no such inference is justifiable, then *Trieloff* was not called upon to explain and show that this bequest was a free and voluntary one by the deceased.

"The field for the operation of undue influence or fraud being shown, together with satisfactory indications that the operation has taken place, then from that situation springs the presumption of fact that the person charged with the wrongdoing must meet and overcome by showing affirmatively that there was no wrong. A presumption against a person charged does not exist from the mere fact that there is such a charge, but because of facts and circumstances appearing which satisfactorily suggest wrong, and it is not till such facts and circumstances appear that it can properly be said the burden of proof to disprove wrong is on the person charged." *Small v. Champeny,* 102 Wis. 61, 78 N. W. 407.

A consideration of all the evidentiary facts and circumstances material to this finding fails to show or suggest that *Trieloff* did, or attempted to do, anything to induce or persuade the deceased to make a will or to make him a beneficiary, should one be made. All the facts suggested by the court as the basis for such an inference cannot only readily and naturally be explained as in perfect harmony with *Trieloff's* exemption from wrongful conduct in the respect charged, but, when considered in the light of what actually took place, there is an entire absence of any wrongful purpose or the actual doing of any act indicating that he was attempting to influence the deceased in disposing of his property. Considerable stress is laid on the fact that *Trieloff* called on him four times on the day the instrument was drawn and that he held confidential interviews with him. True, he called; but it appears that he did so in response to requests from the deceased and from persons at the house, and there is nothing to show that the act of making a will was considered or spoken of by them, or that *Trieloff* had an opportunity before his last visit, when the will was about to be prepared, to communicate with the deceased concerning the making of a will. So

far as shown, he first learned of this after the deceased had conferred with Dr. Palmer on the subject and had told him that he wished to leave some of his property to *Trieloff*. The conduct of the deceased when he made this instrument and directed its provisions in *Trieloff's* absence indicates that he was free from all restraint or compulsion and was acting freely, voluntarily, and deliberately.

It is contended that the provisions of the will for the widow and children indicate that he was unduly influenced to deprive them of what he would naturally have bestowed upon them had he acted freely and voluntarily. We are unable to find any sound basis for this contention. He seems to have made such provision for them as in his judgment seemed just and proper. This leaves the conclusion that a *prima facie* case of undue influence is shown against *Charles Trieloff* without support in the evidence, and the court erred in holding that he was called upon to meet and overcome such a showing.

*By the Court.*—The judgment is reversed, and the cause is remanded with directions that the court enter judgment admitting the instrument propounded as the will of Herman Muellenschlader to probate, and for further proceedings according to law.